IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND


HARBOR ESTATES LLC <u>et. al</u>       :
                                        :
v.                                      :   Civil No. WMN-05-2033
                                        :
EDWARD V. GIANNASCA <u>et. al</u>       :

<u>**MEMORANDUM**</u>

Before the Court is a motion to dismiss filed by Counter-
Defendants Jack Cayre, Daniel Pfeffer, Midtown Group LLC, Harbor
Estates LLC, CS Baltimore LLC, Midtown Baltimore LLC, and Joseph
Cayre.  Paper No. 13 (on the docket of Civil Action No. WMN-05-
2270).[1]  The motion is fully briefed.  Upon a review of the
pleadings and the applicable case law the Court determines that
no hearing is necessary and that the motion will be granted in
part and denied in part.

**I. FACTUAL AND PROCEDURAL BACKGROUND**

This suit arises out of efforts to develop a luxury

_____

[1] The counterclaim was filed as the complaint in <u>Giannasca
Development Group LLC v. Joseph Cayre</u>, Civil Action No. WMN-05-
2270.  On October 20, 2005, this Court issued an order
consolidating Civil Action No. WMN-05-2270 with Civil Action No.
WMN-05-2033 and designating Civil Action No. WMN-05-2033 as the
lead case.  Thus, the complaint in Civil Action WMN-05-2270
became a counterclaim.

In addition to the challenges addressed in this opinion,
Counter-Defendants also moved to dismiss Counter-Plaintiffs'
claims on the ground that they should have been brought as
compulsory counterclaims in Civil Action No. WMN-05-2033.  With
the consolidation of these actions, that issue was rendered moot.

Also pending is a motion to amend the complaint filed by
Plaintiffs/Counter-Defendants.  Paper No. 32.  The motion is
unopposed and, for good cause shown, will be granted.

residential project on Baltimore's waterfront, (the Ritz Carlton Project).  Counter-Plaintiff Edward V. Giannasca alleges that in May of 2000, he was hired as the President of L.I. Square Corp. to begin development of the Ritz Carlton Project.  After the events of September 11, 2001, caused a significant disruption in the hotel industry which, in turn, "mired the Ritz Carlton Project in debt," Giannasca agreed to assume 100% ownership of the project while agreeing that he would, at some future date, reimburse the owner of L.I. Square $2.7 million.  Counterclaim ¶ 15.

In the summer of 2002, Giannasca became acquainted with Joseph and Jack Cayre, the owners of a New York development company, Midtown Equities, LLC (Midtown).  Giannasca asserts that the Cayres falsely held themselves out to be skilled and experienced real estate developers.  Giannasca and the Cayres began to discuss the possibility of working together on the Ritz Carlton Project, with an initial proposal that Midtown own 50%, Giannasca 25%, and Giannasca's partner 25% of the project.  The Cayres later offered an alternative proposal under which Giannasca would retain just 10% of the project; Giannasca's partner, a 15% interest; and the Cayres/Midtown, a 75% interest. To make this reduced ownership interest more tenable to Giannasca, the Cayres proposed as part of the deal the creation of a new entity, "the Midtown Group," that would develop other properties of which Giannasca would have an equity interest in addition to the Ritz Carlton Project.  Specifically, the Cayres

represented that the new Midtown Group would develop projects in North Hills, Long Island and Miami, Florida, and Giannasca would hold a 5% interest in both of those projects.

An agreement was eventually reached on February 6, 2004, and the parties established Harbor Estates LLC, a Maryland Limited Liability Company [LLC], to develop the Ritz Carlton Project.  An Operating Agreement for Harbor Estates LLC was executed by Giannasca, on behalf of Giannasca Baltimore LLC (a Maryland LLC of which Giannasca is a member), and by Counter-Defendant Daniel Pfeffer, on behalf of CS Baltimore LLC (a Maryland LLC established by the Cayres).  Under the terms of the Operating Agreement, Pfeffer was designated as the Manager but, subject to Pfeffer's direction and control, Giannasca Baltimore LLC, acting through Giannasca, was to manage the day-to-day operations. Operating Agreement ¶ 5.2.2.[2]  The Agreement further provided that

> [Giannasca Baltimore, LLC](and Giannasca)
> agrees to devote its full-time efforts to
> such endeavors through the construction of
> the Project and the sale of the residential
> condominium units.  The Manager shall have
> the right to terminate [Giannasca Baltimore,
> LLC]'s services (a) without notice in the
> event of fraud, willfull misconduct or gross
> negligence or upon the death or permanent
> disability of Giannasca or (b) in the event
> of [Giannasca Baltimore LLC]'s negligence,
> provided that [Giannasca Baltimore LLC] shall

---

[2] The Operating Agreement was attached as an exhibit to the Complaint in Civil Action WMN-05-2033.  Because Counter-Plaintiffs reference the Operating Agreement throughout the Counterclaim, the Court can consider its terms without converting the instant motion to one for summary judgment.

> be given written notice and up to thirty (30)
> days to cure such negligent activity.

Id.

After the execution of the Operating Agreement, the working relationship between Giannasca and the Cayres quickly degenerated.  According to Counter-Plaintiffs,

> the Cayre family and Midtown schemed from the
> very beginning to take advantage of
> [Giannasca]'s good will, skills, hard work,
> relationships, professionalism, and
> experience in Baltimore; entice and ensnare
> him with an interest in the New York and
> Miami Projects; then cut him out of the Miami
> and New York Projects and use the same
> methods to first diminish and then cheat him
> out of his interests in the Baltimore Ritz
> Carlton Project.

Counterclaim ¶ 33.  Counter-Plaintiffs also allege that, contrary to the Counter-Defendants' representations, Midtown lacked (and/or refused to devote) expertise in real estate development. Id. ¶ 31.  Furthermore, they assert that Midtown engaged in "sloppy bookkeeping and serious accounting irregularities" that resulted in unrelated personal services and expenses (such as costs for helicopters, jets and limousines) being charged to the Ritz Carlton Project.

Whether legitimately (as Counter-Defendants claim) or as a pretext to fire Giannasca and obtain his interest in the Ritz Carlton Project (as Counter-Plaintiffs claim), the Cayres criticized Giannasca for diverting his time and energy from his "full-time" obligations to the Ritz Carlton Project to the development of a similar residential project in which Giannasca was involved in New Orleans.  In response to that charge,

4

Giannasca observes that the Operating Agreement does not specifically define the meaning of "full-time." Id. ¶ 23. He also notes the lack of restrictive covenant or non-compete provisions in the agreement, and points to the inclusion of provisions that he believes expressly allowed his pursuit of the New Orleans Project.

> "Nothing in this Agreement shall be deemed to restrict in any way the rights of any Member, or of any Affiliate of any Member, to conduct any other business or activity, whatsoever . . . . The organization of the Company shall be without prejudice to their respective rights (or the rights of their respective Affiliates) to maintain, expand or diversify such other interests and activities and to receive and enjoy profits or compensation therefrom."

Id. ¶¶ 24, 25 (quoting Operating Agreement § 5.3.2).[3]

In the summer of 2005, the hostility and distrust among the parties escalated.  On the morning of June 30, 2005, while Giannasca was away on a family vacation, Defendant Jack Cayre is alleged to have entered Giannasca's office, locked the door behind him and drew the blinds.  According to Giannasca's secretary, Jack Cayre remained in the office for about two hours. Counter-Plaintiffs represent that a subsequent analysis of Giannasca's computer (which was in that office) revealed repeated attempts to open and gain access to personal, non-Midtown-related files.  Counter-Plaintiffs allege that "through this clandestine effort," Jack Cayre succeeded in the "surreptitious review" of

---

[3] The Court notes that § 5.3.2 begins with a qualification not quoted by Counter-Plaintiffs, "[e]xcept as otherwise expressly provided in Section 5.2.2 . . . ."

proprietary information which he retained and distributed to Counter-Defendants and others.

Shortly thereafter, on July 27, 2005, Counter-Defendants filed Civil Action No. WMN-05-2033.  In that suit, they allege that on July 11, 2005, Giannasca was terminated "for cause" based upon his "willful misconduct" and "fraud" in diverting his time and energy from the Ritz Carlton Project to the New Orleans Project.  Counter-Plaintiffs allege that Jack Cayre published false and malicious statements about Giannasca and the lawsuit to various newspapers, to members of the press, and to numerous internet sites.  Counter-Plaintiffs further allege that Counter-Defendant's suit (which Counter-Plaintiffs designate as a "strike suit") was filed in order to damage Giannasca's reputation, interfere with the New Orleans Project and Giannasca's other lawful pursuits, and to further the scheme to defraud the Giannasca entities of their interest in the Ritz Carlton Project.

Less than a month after the Cayre interests filed the alleged "strike suit," Counter-Plaintiffs filed their own suit asserting claims for fraud in the inducement, breach of contract, violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, tortious interference with business and contractual relations, conversion, and civil conspiracy.  Civil Action No. WMN-05-2270.  Counter-Defendants have moved to dismiss several counts as to some or all Counter-Defendants, raising the following arguments:

> (1) the fraud in the inducement claim (Count One) fails to provide sufficient particularity to conform to Rule 9(b);

(2) Counter-Defendant Harbor Estates LLC cannot be liable for breach of contract (Count Two) as it was not a party to the Operating Agreement;

(3) the breach of contract, loyalty, and duty of care claim (Count Four) against Counter-Defendant Pfeffer must fail as Pfeffer was not a party to the Operating Agreement;

(4) the counterclaim does not allege the particular kind of damages actionable under the Computer Fraud and Abuse Act (Count Three);

(5) the tortious interference claim (Count Five) fails to identify the particular contract or relationships damaged by the alleged conduct; and

(6) the civil conspiracy claim (Count Six) must fail in the absence of a viable underlying tort.

## II. LEGAL STANDARD

A motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure should not be granted unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957).  In considering such a motion, the court is required to accept as true all well-pled allegations in the Complaint, and to construe the facts and reasonable inferences from those facts in the light most favorable to the plaintiff.  See Ibarra v. United States, 120 F.3d 472, 473 (4th Cir. 1997).  "To survive a motion to dismiss, [Counter-]Plaintiff[s] must have alleged facts that show that they are entitled to relief on their substantive causes of

action." <u>In re Criimi Mae, Inc. Securities Litigation</u>, 94 F.
Supp. 2d 652, 656 (D. Md. 2000).

### III. DISCUSSION

### A. Fraud in the Inducement

To plead a cause of action for fraud, a plaintiff must
allege:

>(1) that a representation made by the
>defendant was false;
>
>(2) that either its falsity was known to the
>defendant or the misrepresentation was made
>with such reckless indifference to truth as
>to impute knowledge to him;
>
>(3) that the misrepresentation was made for
>the purpose of defrauding the plaintiff;
>
>(4) that the plaintiff not only relied upon
>the misrepresentation but had the right to
>rely upon it with full belief in its truth,
>and that he would not have done the thing
>from which damage resulted if it had not been
>made; and
>
>(5) that the plaintiff suffered damage
>directly resulting from the
>misrepresentation.

<u>Appel v. Hupfield</u>, 84 A.2d 94, 95-96 (Md. 1951).

Furthermore, a claim for fraud is subject to the heightened
pleading standard of Rule 9(b) of the Federal Rules of Civil
Procedure.  Under that rule, "the circumstances constituting
fraud or mistake shall be stated with particularity."  "[T]he
'circumstances' required to be pled with particularity under Rule
9(b) are 'the time, place, and contents of the false
representations, as well as the identity of the person making the
misrepresentation and what he obtained thereby.'"  <u>Harrison v.</u>

<u>Westinghouse Savannah River Co.</u>, 176 F.3d 776, 784 (4th Cir. 1999) (quoting 5 Charles Alan Wright and Arthur R. Miller, <u>Federal Practice and Procedure: Civil</u> § 1297, at 590).[4]  "Where multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his alleged participation in the fraud." <u>DiVittorio v. Equidyne Extractive Indus., Inc.</u>, 822 F.2d 1242, 1247 (2nd Cir. 1987).

Here, Counter-Plaintiffs have alleged that Joseph Cayre, Jack Cayre, and Daniel Pfeffer[5] made a series of misrepresentations in the summer of 2002, which were known to be false when made, for the purpose of inducing Giannasca to enter into a business relationship through which they intended to appropriate Giannasca's interests in the Ritz Carlton Project. Those alleged misrepresentations include: that the Cayres and Midtown Equities LLC were experienced real estate developers who had completed significant real estate projects; that Giannasca would receive a 5% equity ownership interest in the Long Island Midtown Project and the Miami Midtown Project; and that pre-closing balances owed to vendors and pre-closing payroll tax

---

[4] Rule 9(b) "allows conclusory allegations of defendant's knowledge as to the true facts and of defendant's intent to deceive." <u>Id</u>.

[5] Counter-Plaintiffs also allege that they were induced by representations made by CS Baltimore LLC.  As Counter-Defendants note, CS Baltimore LLC was not formed until February 6, 2004. Reply 3 n.3 (directing the Court to public records available at the state department of assessments and taxation).  In light of the impossibility of CS Baltimore LLC making representations within the time frame specified in the Counterclaim, Count One will be dismissed as to that Counter-Defendant.

obligations would be considered costs of the Ritz Carlton Project and would be paid.  Counterclaim ¶ 66.[6]  Giannasca further alleges that he relied upon those misrepresentations in determining to enter into the business relationship and that he suffered significant damages as result.

Counter-Defendants primary challenge to this claim is that Counter-Plaintiffs failed to alleged which Counter-Defendant made which misrepresention.  Counter-Plaintiffs respond that they are alleging that each of the Counter-Defendants (Daniel Pfeffer, Joseph Cayre, and Jack Cayre) made each of these representations, and the language of the counterclaim supports that response. Counterclaim ¶¶ 67, 70.  Because the Court must accept as true the allegations in the counterclaim, the Court finds that Counter-Plaintiffs have met the pleading requirements of Rule 9.

B. Breach of Contract (Harbor Estates LLC and Pfeffer)

In Count Two, Counter-Plaintiffs bring breach of contract claims against CS Baltimore LLC and Harbor Estates LLC.  The only contract to which Counter-Plaintiffs allude in that count is the Operating Agreement.  In Count Four, Counter-Plaintiffs bring a

---

[6] Some of the alleged misrepresentations, however, clearly lack the requisite specificity to support a claim of fraud.  For example, Counter-Plaintiffs allege that the Cayres and Pfeffer represented that "Midtown interests treated their business partners "like family."  Counterclaim ¶ 66.  See  Miller v. Premier Corp., 608 F.2d 973, 981 (4th Cir. 1979) ("an unspecific and false statement of opinion such as occurs in puffing generally cannot constitute fraud"); see also, Steigerwald v. Bradley, 136 F.Supp.2d 460, 470 (D. Md. 2001).

breach of contract claim against Pfeffer, again based upon alleged breaches of the Operating Agreement. Counter-Defendants move to dismiss the breach of contract claim against Harbor Estates LLC and Pfeffer relying on one of the fundamental tenants of contract law, i.e., that one cannot be held to a contract to which he is not a party. Mot. at 10 (citing Nizam Inst. of Medical Sciences v. Exchange Technologies, 28 F.3d 1210 (4th Cir. 1990)). The Operating Agreement was a contract solely between CS Baltimore LLC and Giannasca LLC.

Counter-Plaintiffs point to no statutory or common law authority that would create an exception to this basic principle of the law of contract. While they do cite Section 4A-402(a)(1) of the Limited Liability Company Act [the Act] and Chevy Chase Sav. & Loan v. Maryland, 509 A.2d 670 (Md. 1986), these authorities do not support Counter-Plaintiffs' position. Section 4A-402(a)(1) simply provides that "members [of an LLC] may enter into an operating agreement to regulate or establish any aspect of the affairs of the limited liability company or the relations of its members." As Counter-Defendants observe and as the quoted statutory language reflects, this provision is contained in the subtitle of the Act governing the "Relationship of Members to Each Other." As to the Chevy Chase Sav. & Loan decision, it addressed an entirely different corporate form and has no particular relevance to an LLC.[7]

───────────────

[7] Chevy Chase was a suit by a savings and loan institution against Maryland's nonstock, nonprofit corporation that provided insurance and central reserve funds for savings and loan

In addition to this blackletter law reason to dismiss Counter-Plaintiffs' breach of contract claims against Harbor Estates LLC, the nature of the claims themselves reveal the inappropriateness of asserting them against that Counter-Defendant.  Counter-Plaintiffs allege in Count Two that Counter-Defendants breached the Operating Agreement in the following ways:

> - "scheming to create the illusion that Plaintiffs were disloyal;"
>
> - "falsely asserting that [Counter-]Plaintiffs violated the terms of the Operating Agreement;"
>
> - "creating documents purporting to deprive [Counter-]Plaintiffs of their ownership in the Ritz Carlton Project;"
>
> - "Joseph Cayre made the decision to effectively replace Dan Pfeffer with his oldest son, [] Jack Cayre, as the manager;"
>
> - "converted [Counter-]Plaintiffs' interest in Harbor Estates LLC wrongfully, maliciously, in bad faith and without cause;" and
>
> - misappropriated Giannasca's proprietary files.

Counterclaim ¶¶ 73-76.  To the extent that these allegation even identify "breaches" that would sound in contract, they clearly reflect the alleged actions of one member of an LLC, CS Baltimore LLC, or its agents, taken against the other member, Giannasca Baltimore LLC.

The breach of contract claim against Pfeffer fails for

_____

institutions.

similar reasons.  See Ayres v. AG Processing Inc., 345 F.Supp.2d 1200, 1215-16 (D. Kan. 2004) (dismissing breach of operating agreement claims against LLC's non-member managers on the ground that "a contract binds no one but the parties to it").   In addition, to the extent that the complaints against Pfeffer sound at all in contract, most reflect duties Pfeffer owed, as the manager of Harbor Estates LLC, to Harbor Estates LLC.  Counter-Plaintiffs allege that Pfeffer breached his duties by, inter alia,

> - "Ced[ing] his management responsibilities to Defendant Jack Cayre;"
>
> - "Engaging in such poor accounting practices that the General Ledger for the Project had to be completely reconstructed;"
>
> - "Lacking a firm plan, and repeatedly changing directions, all causing Project expenses to increase;"
>
> - "Hiring out-of-town consultants who were unfamiliar with issues unique to Baltimore;"
>
> - "Running up project costs due to inexperience;" and
>
> - "Alienating contractors and valuable employees with ineffective, inappropriate, and condescending management style."

Counterclaim ¶ 87.  Many of these alleged breaches clearly flow from a duty directly owed to Harbor Estates LLC and only indirectly to its members.  Thus, they would be more properly brought as derivative claims.  While the Act provides for derivative actions by members to enforce the rights of an LLC, see Md. Code Ann., Corps. & Ass'ns §§ 4A-801 to 4A-804, Counter-Plaintiffs have not pled their claim as such.

C. The Computer Fraud and Abuse Act

Based upon the June 30, 2005, incident in which Jack Cayre is alleged to have gained unauthorized assess to Giannasca's personal computer and reviewed, retained, and distributed confidential or proprietary information, Counter-Plaintiffs attempt to bring claims against Jack Cayre, Midtown Baltimore LLC, and Harbor Estates LLC under two subsections of the Computer Fraud and Abuse Act [the CFAA], §§ 1030(a)(5)(A)(i) and § 1030(a)(5)(A)(iii).  Stopping short of alleging that Jack Cayre actually erased, altered, or damaged any files or programs in the computer,[8] Counter-Plaintiffs assert that they suffered damage in that Jack Cayre's conduct forced them to hire experts to "conduct a thorough forensic investigation" of the computer and that the misappropriated information was used in the effort to divest them of their interests in Harbor Estates LLC and to damage their other businesses and reputation.  Counterclaim ¶ 81.

---

[8] In the narrative portion of the Counterclaim describing this incident, Counterclaim ¶¶ 48-53, Counter-Plaintiffs make no mention of any alteration or destruction of any data on the computer.  In Count Three itself, Counter-Plaintiffs posit that "in the event that files have been permanently deleted, [Counter-Defendants] deprived [Counter-]Plaintiffs of evidence for use in the prosecution of claims asserted herein and in defense of the frivolous claims asserted by them in the 'strike suit.'"  Id. ¶ 81.  This falls short of an actual allegation that files were deleted and, as Counter-Plaintiffs are in possession of the computer in question and subjected it to a thorough forensic examination, they would be in the position to make such an assertion if it were the case that Cayre deleted or altered files.  In their opposition to the motion to dismiss, Counter-Plaintiffs make no argument that any files were altered or deleted, but instead, base their assertion of "damage" on the theories discussed below.

The CFAA is a criminal statute that also includes a provision for civil remedies.  18 U.S.C. § 1030(g).  The portions of the statute upon which Counter-Plaintiffs rely make criminal the acts of an individual who "knowingly causes the transmission of a program, information, code, or command, and as a result of such conduct, intentionally <u>causes damage</u> without authorization, to a protected computer;"[9] <u>id.</u> § 1030(a)(5)(A)(i) (emphasis added), or "intentionally accesses a protected computer without authorization, and as a result of such conduct, <u>causes damage</u>'" <u>id.</u> § 1030(a)(5)(A)(iii) (emphasis added).  In addition, to be actionable, the conduct must have "<u>caused loss</u> to 1 or more persons during any 1-year period . . . aggregating at least $5,000 in value."  <u>Id.</u> § 1030(a)(5)(B)(i) (emphasis added).  Thus, establishing a violation of either § 1030(a)(5)(A)(i) or § 1030(a)(5)(A)(iii) requires proof of both "damage" and "loss."

The meaning of both of these terms is now set out in the statute.[10]  The term "damage" is defined in the statute as "any impairment to the integrity or availability of data, a program, a system, or information."  <u>Id.</u> § 1030(e)(8).  The term "loss" is defined as "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and

---

[9] A "protected computer" is defined as computer "which is used in interstate or foreign commerce or communications." § 1030(e)(2).  There is no dispute that the computer in question was a "protected computer."

[10] Prior to amendment of the statute in 2001, the term "loss" was not defined.  This definition was added as part of the USA Patriot Act of 2001, Pub. L. No. 107-56, § 814(d)(5).

restoring the data, program, system or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service."  Id. § 1030(e)(11).  The primary issue in dispute here is whether Jack Cayre's review, retention, and distribution of confidential information on Giannasca's computer "caused damage" as that phrase is defined in the CFAA.  Courts have split on that question under factual circumstances similar to those presented here.

The leading case finding "damage" despite the lack of any alteration or deletion of information on the protected computer is Shurgard Storage Centers, Inc. v. Safeguard Self Storage, Inc., 119 F.Supp.2d 1121 (W.D. Wash. 2000).  In Shurgard, an employee of a self-storage company used the company's computers to send to a competitor company e-mails containing the employer's trade secrets and propriety information.  The employee later went to work for the competitor and used that e-mailed information to aid his new employer.  In finding that the employee's e-mailing of propriety information caused "damage" within the meaning of the provision that is now codified as § 1030(a)(5)(a)(iii),[11] the court looked to the CFAA's definition of damage, i.e., "any impairment to the integrity . . . of data . . . or information," and found "integrity" to be an ambiguous term.  119 F. Supp. 2d

---

[11] When Shurgard was decided, this subsection was designated as § 1030(a)(5)(C).  This subsection was re-numbered when the CFAA was amended in 2002.  Pub. L. No. 107-273, § 4005, 116 Stat. 1807 (2002).

at 1126.  Having determined the statute to be ambiguous, the
court then turned to the legislative history, specifically the
following example from the Senate Report regarding the 1996
amendments to the CFAA, to "determine if 'integrity' and thus
'damage' could include the alleged access and disclosure of trade
secrets in [the case then before it]:"

> "The 1994 amendment required both 'damage'
> and 'loss,' but it is not always clear what
> constitutes 'damage.'  For example, intruders
> often alter existing log-on programs so that
> user passwords are copied to a file which the
> hackers can retrieve later.  After retrieving
> the newly created password file, the intruder
> restores the altered log-on file to its
> original condition.  Arguably, in such a
> situation, neither the computer nor its
> information is damaged.  Nonetheless, this
> conduct allows the intruder to accumulate
> valid user passwords to the system, requires
> all system users to change their passwords,
> and requires the system administrator to
> devote resources to resecuring the system.
> Thus, although there is arguably no 'damage,'
> the victim does suffer 'loss.'  If the loss
> to the victim meets the required monetary
> threshold, the conduct should be criminal,
> and the victim should be entitled to relief.
>
> The bill therefore defines 'damage' in new
> subsection 1030(e)(8), with a focus on the
> harm that the law seeks to prevent."

Shurgard, 119 F.Supp.2d at 1126-27 (quoting S.Rep. No. 104-357,
at 11 (1996)).

    The court then concluded,

> in this case, the defendant allegedly
> infiltrated the plaintiff's computer network,
> albeit through different means than in the
> example, and collected and disseminated
> confidential information. In both cases no
> data was physically changed or erased, but in
> both cases an impairment of its integrity
> occurred.  From the legislative history it is

17

> clear that the meaning of "integrity" and
> thus "damage" apply to the alleged acts of
> the defendant in this case and thus the
> plaintiff has stated a claim under 18 U.S.C.
> § 1030(a)(5)(C).

Id. at 1127.[12]

Other courts have taken a different approach.  Just last

year, the District Court for the Middle District of Florida

strongly criticized the Shurgard court's reasoning:

> Based on legislative history, Shurgard
> adopted an unusual and extraordinary
> interpretation of the word "integrity" within
> the CFAA's definition of "damage" - i.e.,
> "any impairment to the integrity or
> availablity of data . . . or information."
> It found "integrity" to contemplate the loss
> of a trade secret's exclusive value.
> "Integrity," however, ordinarily means
> "wholeness" or "soundness," Oxford English
> Reference Dictionary 731 (Rev. 2nd ed. 2002),
> and contemplates, in this context, some
> diminution in the completeness or useability
> of data or information on a computer system.
> This Court finds no meaningful ambiguity that
> might weigh in favor of relying on
> legislative history.

Resdev, LLC v. Lot Builders Association, Inc., Civil Action No.

6:04-1374ORL31AB, 2005 WL 1924743 (M.D. Fla. Aug. 10, 2005).

In Register.com v. Verio, Inc., 126 F.Supp.2d 238 (S.D.N.Y.

2000), the defendant allegedly used robotic searches to collect

material from the plaintiff's website in violation of the

---

[12] Other courts have concluded similarly to Shurgard but
without much elaboration as to their reasoning.  See, e.g.,
George S. May v. Hostetler, Civil Action No. 04-1606, 2004 WL
1197395 at *4 (N.D. Ill. May 28, 2004) (relying exclusively on
Shurgard and baldly concluding, "[w]e see no principled reason .
. . why infringement of copyrighted material taken from a
protected computer system would not qualify as impairment of the
integrity of the copyrighted information);

website's terms of use and then used that material to compete

with the plaintiff.   The plaintiff argued that the revenue it

lost as a result of the defendant's exploitation of that data

constituted damages as required under § 1030(a)(5)(C) (now, §

1030(a)(5)(iii)).   In rejecting that argument, the court

observed, "[]how [the defendant] uses the [plaintiff's] data,

once extracted, has no bearing on whether [the defendant] has

impaired the availability or integrity of [the plaintiff's] data

or computer systems in extracting it.   Accordingly, because

violating an anti-marketing restriction on the end use of data

harms neither the data nor the computer and therefore does not

cause the type of harm that § 1030(a)(5)(C) addresses, the

specific good will damages cited by [the plaintiff] cannot

satisfy its burden under § 1030(a)(5)(C)."   126 F.Supp.2d at 252

n.12 (emphasis added).[13]

---

[13] Counter-Plaintiffs cite EF Cultural Travel BV v.
Explorica, Inc., 274 F.3d 577 (1st Cir. 2001), in support of
their CFAA claims.   Opp'n 19.   In Explorica, the defendant used a
"scraper" program to harvest the equivalent of eight telephone
directories of pricing information from the plaintiff's website
and then used that information to compete with the plaintiff.   In
granting a preliminary injunction against the defendant, the
district court did conclude, as Counter-Plaintiffs note, "that EF
could show that it suffered a loss, as required by the [CFAA],
consisting of reduced business, harm to its goodwill, and the
cost of diagnostic measures it incurred to evaluate possible harm
to EF's system, although it could not show that Explorica's
actions physically damaged its computers."   274 F.3d at 580
(emphasis added).   That conclusion, however, was made in
conjunction with a finding that EF was likely to succeed under §
1030(a)(4), a different section of the CFAA than that upon which
Counter-Plaintiffs rely.   Id. at 581.   Section 1030(a)(4) does

This Court finds that it must agree with the reasoning of
Resdev.  While the Shurgard court may be correct that Congress
intended to allow conduct that impairs or compromises the
confidential status of data or information within a computer
system to give rise to a cause of action under the CFAA, the
language it chose is simply not that broad.  The Court has
referenced numerous dictionaries and has discovered no meaning
for "integrity" that varies from that identified by the court in
Resdev, i.e., the quality or state of being complete.  It has
long been one of the most basic principles of statutory
construction that

> "the intention of the legislature is to be
> collected from the words they employ.  Where
> there is no ambiguity in the words there is
> no room for construction.  The case must be a
> strong one indeed, which would justify a
> court in departing from the plain meaning of
> words . . . in search of an intention which
> the words themselves did not suggest."

Watt v. Alaska, 451 U.S. 259, 285-286 (1981) (quoting United
States v. Wiltberger, 18 U.S. 76, 95-96 (1820));  See also,
Chapman v. United States, 500 U.S. 453, 462 (1991) ("It is a
settled axiom of statutory construction that nontechnical,
undefined words in a statute are normally given their plain or
ordinary meaning."); Jones v. Liberty Glass Co., 332 U.S. 524,
531 (1947) ("In the absence of some contrary indication, we must
assume that the framers of these statutory provisions intended to

---

not require a showing of "damage."  Notably, the district court
found that EF was unlikely to succeed on the claims under §
1030(5)(C).  See, id. at 581 n.7.

convey the ordinary meaning which is attached to the language they used.").[14]

Concluding that Counter-Plaintiffs have not alleged that Jack Cayre's access to Giannasca's computer "caused damage" as that term is defined in the CFAA, the Court will grant Counter-Defendants' motion as to Count Three.

D. Tortious Interference

In Count Five of the Counterclaim, Counter-Plaintiffs attempt to state two different but closely related torts: the tort of intentional interference with contract and the tort of intentional interference with business relations.  To establish the former, a plaintiff must demonstrate:

(1) existence of a contract between plaintiff and a third party;

(2) defendant's knowledge of that contract;

(3) defendant's intentional interference with that contract;

(4) breach of that contract by the third party; and

(5) resulting damages to the plaintiff.

---

[14] The legislative history cited in Shurgard actually gives further support to the conclusion that the plain and ordinary meaning of the phrase "causes damage" does not include the type of harm allegedly suffered here.  In the brief excerpt quoted in Shurgard, the Senate Report twice acknowledges, at least implicitly, that one would not normally consider the type of harm referenced in its example as "damage."  The Report concedes, "[a]rguably, in such a situation, neither the computer nor its information is damaged.  119 F.Supp.2d 1126 (citing S. Rep. No. 104-357, at 11) (emphasis added).  Two sentences later, the Report repeats the same concession: "[t]hus, although there is arguably no 'damage . . . .'"

havePOWER, LLC v. General Electric Co., 183 F.Supp.2d 779, 784

(D. Md. 2002).  The elements needed to establish a claim of

tortious interference with business relations are similar:

>    (1) intentional and willful acts;
>
>    (2) calculated to cause damage to the
>    plaintiffs in their lawful business;
>
>    (3) done with the unlawful purpose to cause
>    such damage and loss, without right or
>    justifiable cause on the part of the
>    defendants (which constitutes malice); and
>
>    (4) actual damage and loss resulting.

Id.

Counter-Defendants challenge these claims on grounds of

specificity.  With respect to the claim for intentional

interference with contract, they assert that Counter-Plaintiffs

failed to identify the particular third party with whom any

Counter-Plaintiff had a relationship and failed to identify a

single breach by a third party.  As to the claim for intentional

interference with business relations, they assert that Counter-

Plaintiffs have failed to identify the particular relationships

that were actually damaged by Counter-Defendants' alleged

interference or to enumerate the "intentional and willful acts"

that allegedly interfered with those relations.

Under the liberal notice pleading provisions of the Federal

Rules, the Court finds that Counter-Plaintiffs' interference with

business relations is adequately pled.  Counter-Plaintiffs

identify several groups of potential individuals with which they expected to enter business relationships, including, partners and investors in new projects and potential purchasers of units in the New Orleans and Ritz Carlton Projects.  Among the intentional and willful acts alleged are the filing of an unsupported "strike suit," threats made to vendors and suppliers, and distribution of defamatory statements to the press.  These actions, Counter-Plaintiffs claim, caused them damages and further alleged that Counter-Defendants intended by those actions to cause that damage.

Counter-Plaintiffs' allegations, however, do not support an interference with contract claim.  Nowhere in the Counterclaim is there any allegation that any third party breached an existing contract.  In addition to the breach of the Operating Agreement, the only breach of a contract that is arguably pled in the Counterclaim is Counter-Defendants' breach of Giannasca's employment contract.  "As a matter of law, [however,] a party to a contract cannot tortiously 'interfere' with his own contract; the party can, at most, breach it."  Bagwell v. Peninsula Regional Medical Center, 665 A.2d 297, 313 (Md. App. 1995).  In the absence of any allegation of the breach of a existing contract by a third party, Counter-Plaintiffs' intentional interference with contract claim must fail.

E. Civil Conspiracy

In Count Six, Counter-Plaintiffs assert a claim of civil conspiracy against Joe Cayre, Jack Cayre, and Dan Pfeffer.  To

state a claim for civil conspiracy under Maryland law, a plaintiff must show: (1) an agreement or understanding between two or more persons; (2) some unlawful or tortious act done in furtherance of the conspiracy or use of unlawful or tortious means to accomplish an act not in itself illegal; and (3) actual legal damage to the plaintiff.  See Van Royen v. Lacey, 277 A.2d 14 (Md. 1971).  Counter-Defendants challenge this claim on the ground that a claim for civil conspiracy "is viable only if there is an underlying tort, which is, in itself, sufficiently alleged."  Mot. 17 (citing Alleco Inc. v. Harry & Jeanette Weinberg Foundation, Inc., 665 A.2d 1038, 1045 (Md. 1995)).  As the Court has found that Counter-Plaintiffs have adequately alleged claims of fraudulent inducement and tortious interference with business relations, Counter-Defendants' challenge to the conspiracy claim fails.

While Counter-Plaintiffs have technically pled a civil conspiracy claim against these three individuals, it is unclear what this claim adds in practical terms to the Counterclaim. Typically, a conspiracy claim is added to a complaint so that "the party wronged may look beyond the actual participants in committing the injury, and join with them all defendants who conspired to commit it" or in circumstances where the "fact of conspiracy may aggravate the wrong."  Robinson v. Parks, 24 A.2d 411, 413 (Md. 1894).  Counter-Plaintiffs have brought the underlying torts against these same three individuals and the alleged harm of the torts seems identical to the alleged harm of

the conspiracy.  So while the Court will not dismiss the conspiracy claim at this time, should Counter-Plaintiffs' tort claims survive summary judgment, the Court may revisit the basis for putting the conspiracy claim before the jury.

**IV. CONCLUSION**

For the above-stated reasons, the Court will dismiss: the fraud claim (Count One) against CS Baltimore LLC; the breach of contract claim (Count Two) against Harbor Estates LLC; the CFAA claim (Count Three) against all Counter-Defendants; the breach of contract claim (Count Four) against Pfeffer; and, the tortious interference with contract claim (Count Five) against all Counter-Defendants.  In all other regards, the motion to dismiss will be denied.  The Court will also grant Plaintiffs/Counter-


Defendants' motion to amend the Complaint.  A separate order consistent with this memorandum will issue.


                                              /s/
                              _____
                              William M. Nickerson
                              Senior United States District Judge


Dated: February 9, 2006